1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              NORTHERN DISTRICT OF CALIFORNIA

10

11    SALMA AGHMANE,                              No. C-13-03698 DMR

12              Plaintiff,                        **ORDER ON PARTIES' MOTIONS FOR**
                                                 **SUMMARY JUDGMENT**
13         v.

14    BANK OF AMERICA, N.A.,

15              Defendant.
      _____/
16

17         Plaintiff Salma Aghmane brings this employment discrimination action against Defendant

18    Bank of America, N.A. ("BANA"), asserting claims for sex, race, and national origin discrimination,

19    violation of California's Equal Pay Act, blacklisting, defamation, several other tort claims, and

20    failure to pay wages.  Both parties now move for summary judgment pursuant to Federal Rule of

21    Civil Procedure 56.  [Docket No. 65 (Def.'s Mot.), 79 (Pl.'s Mot.).]  Having carefully considered the

22    parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the

23    court hereby grants Defendant's motion in part and denies Plaintiff's motion.

24                              **I. Facts[1] & Background**

25    _____

26              [1] The court notes that Plaintiff submitted Objections to Evidence in violation of the Court's local
      rules.  [Docket No. 95.]  Civil Local Rule 7-3(a) requires that "[a]ny evidentiary . . . objections to [a]
27    motion be contained within the brief or memorandum."  N.D. Cal. Civ. L.R. 7-3(a).  If a party files
      objections in a separate document, the court will strike and disregard them.  *See, e.g., Ferretti v. Pfizer,*
28    *Inc.*, No. 11-4486 LHK, 2013 WL 140088, at *1 n.1 (N.D. Cal. Jan. 10, 2013).  The court therefore
      strikes Plaintiff's Objections from the record.  The court will consider any evidentiary objections which

United States District Court
For the Northern District of California

The facts in this case are largely undisputed.  Defendant BANA hired Plaintiff in New York as a Vice President, Client Manager in May 2008.  (Joint Statement of Undisputed Facts ("UF") 8, 10.)  In October 2009, she transferred to the same position in San Francisco, California, reporting to Market Executive Claudio Cipollina.  (UF 11-13.)  Plaintiff's job responsibilities included managing the relationship between Defendant and a portfolio of business banking clients, and growing the portfolio by selling business banking services to new and existing clients.  (UF 14.)

**A.      Plaintiff's Incentive Compensation Plan**

Defendant's Client Managers receive an annual salary and participate in a bonus plan, the terms of which are set forth in Defendant's annual "Incentive Plan."  (UF 92, 96.)  Each Client Manager is given a "Baseline Incentive Opportunity," or "BIO," which is formulated from performance goals applicable to the employee's role.[2]  (UF 97; Feldman Decl. Oct. 9, 2014, Ex. E.)  Defendant adjusts the BIO to determine a Client Manager's annual bonus based on two components, the "what" and the "how" of an employee's performance.  The bonus is also contingent upon the performance of the line of business as well as the corporation as a whole.  (UF 100; Feldman Decl. Ex. E.)  An employee's "what" rating, also called a "composite score," is a percentage derived by comparing the employee's actual performance against set goals.  (UF 99.)  This component is non-discretionary.  (Feldman Decl. Ex. E.)  The "how" performance rating is based on management's assessment of how an employee achieves results, or behaviors exhibited in performing his or her job.  (Feldman Decl. Ex. E; UF 100.)

Pursuant to the Incentive Plan, Defendant made payments on February 15 of the year following the applicable performance period (January 1 to December 31).  (UF 101, 102, 104.)[3]  The

---

the parties included in their briefs.  *See Lotes Co. v. Hon Hai Precision Indus. Co.*, No. 11-1036 JSW, 2012 WL 2917450, at *1 n.1 (N.D. Cal. July 17, 2012).

[2] The parties do not provide any further detail on how Defendant determines each employee's BIO, nor does Plaintiff challenge the method by which Defendant determined her (or any other employee's) BIO.

[3] The February 15 payments thus complied with the terms of the Incentive Plan.  For example, the 2012 Incentive Plan provides that payments of incentive awards "will be made as soon as administratively practicable following the end of the applicable performance period, but in no event later than March 15 immediately following the calendar year in which the applicable performance period ends."  (UF 103.)  Where the performance period ends on December 31, "payment shall be made on or

Incentive Plan set forth Defendant's purpose and intent in providing incentive payments, as well as the eligibility requirements for receiving payments:

> The Plan is intended to reward current job performance but its most fundamental purpose is to provide an incentive for future individual performance of eligible Plan participants.  It is also designed not only to attract but especially to retain qualified employees.  Also, because the performance of the business and company overall determine the size of the available incentive pool, the contribution of any individual cannot be determined except on a performance period basis (e.g., quarterly, annually) for achievement of goals and a comparison of performance with others.  For all these reasons, participants whose employment is terminated (either by Bank of America or the participant) prior to the payment date of an incentive award are no longer eligible to be Plan participants and as such, are not eligible to receive a Plan award or other incentive payment, subject to the requirements of applicable law.

(UF 107; Feldman Decl. Ex. E (BANA-00770[4]).)  Plaintiff's offer letter states, in part, that she would be eligible for "a discretionary Performance Incentive Award based upon: [1] your overall performance; [2] the contributions of your Group; and [3] the overall success of the Company, provided you remain an employee in good standing at the time future Performance Incentive Awards are paid."  (UF 106.)

**B.    Unauthorized Transactions on Family Member's Bank Account**

Plaintiff's cousin's daughter, D.A.,[5] held a bank account with Defendant.  In October 2012, D.A. filed a claim with Defendant's fraud claims department regarding ATM transactions.  (UF 16; Glover Decl., Oct. 8, 2014, Ex. A (Fraud Case Notes 11/20/12).)  On November 16, 2012, D.A. filed another fraud claim, alleging that someone conducted several unauthorized transactions in her

---

after January 1 and on or before March 15 immediately following the end of the performance period."  (UF 103.)

[4] The Ninth Circuit set forth the applicable standards governing requests to seal in *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006).  Where, as here, a party seeks to seal records filed in connection with dispositive motions, a "compelling reasons" standard applies.  A party seeking to seal judicial records must show that "compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure."  *Id*. at 1178-79 (internal quotation marks and citations omitted).  While the court grants Defendant's motion to seal the exhibit containing Defendant's 2012 Business Banking Incentive Plan on the grounds that it is a confidential trade secret, the court finds that the portions of the Incentive Plan excerpted in this opinion do not meet the "compelling reasons" standard as the excerpts themselves do not contain trade secrets or any other confidential information.

[5] The court uses initials instead of full names where privacy rights are implicated, and where the use of a full name is not relevant to the dispute.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

account in September and October 2012.  (UF 18, 19.)  D.A. signed a "Fraud Statement of

Claimant," which listed unauthorized transactions including a $3,200 transfer from D.A.'s savings

account to her checking account, and $12,800 in bill pay transactions to American Express, Chase

Cardmember Services, and a third party.  (UF 19; Glover Decl. Ex. B (Fraud Statement).)

Defendant's fraud claims and retail investigations departments identified fifteen transactions

totaling $21,900 in successful or attempted withdrawals from D.A.'s account.  (UF 18.)  Defendant

stopped payment on $9,100 of the transactions and provisionally credited D.A.'s account for

$12,800 on November 28, 2012.  (UF 18, 23.)

     Defendant further investigated the unauthorized transactions in D.A.'s account and learned

that Plaintiff had conducted the transactions from her cousin's online banking account.  (UF 18, 32,

39.)  Seven of the transactions were online bill payments to credit card accounts in Plaintiff's name,

and six were payments to one of Plaintiff's former coworkers.  (UF 18.)  Defendant also discovered

that Plaintiff used Defendant's internal systems to access D.A's account several times immediately

before and during the period of the unauthorized transactions.  (UF 31, 32.)

     D.A., who lived in Morocco at the time of the investigation, had several phone calls with

Defendant's fraud analysts in November and December 2012, summaries of which are in

Defendant's fraud case notes.  (Glover Decl. ¶¶ 1-4.)  The case notes from December 4, 2012

summarize a conversation with D.A. via a French translator:

> [D.A.] states she knows Salma Aghmane, she is her cousin.  Sender stated that
> Salma lives in San Francisco and she went with her to open her account because
> [D.A.] did not speak English well and then after that she never saw her again.
> [D.A.] stated that she never lived w/ Salma, never gave info, or cards.  [D.A.]
> suspects that she took her personal info the day she translated for her and she never
> saw her again.  [D.A.] was upset to learn the [sic] her cousin was recieving [sic]
> funds.

4

United States District Court

For the Northern District of California

(Glover Decl. Ex. A (Case Notes[6]).)   D.A. had another conversation with a fraud analyst two days later:

> [D.A.] wanted temp password and claim update.  Explained fraud statement needed.  [D.A.] stated concerns about if we are sure of Salma (her cousin) [sic] involvement.  Explained that we had valid evidence that she received benefit.  [D.A.] stated that her cousin works for BOA. . . . [D.A.] asked what would happen if she were to work it out w/ her cousin, explained that she has a right at any time to [withdraw] claim.

(UF 25.)  On December 12, 2012, D.A. called the fraud analyst to discuss her claim.  A summary of the conversation included the following:

> [D.A.] had questions about claim withdraw process, and what would happen to her cousin Selma [sic].  [D.A.] stated that she is considering contacting her and possibly working it out with Selma [sic]. . . . explained liabilities.  [D.A.] stated that she will get back to me by end of next week of [sic] her decision.

(UF 26.)

On December 21, 2012, Defendant received D.A.'s Fraud Statement of Claimant, which included a "letter of circumstance."  (UF 27.)  In her letter, D.A. stated "I've not used online banking to make any of [these] activities."  (Fraud Statement.)  D.A. checked "no" in response to questions "Are you willing to prosecute?" and "Did you file a police report?" and left blank a question asking her to identify any individual she suspected of having performed the unauthorized transactions on her account.  (UF 20-22.)  D.A. never withdrew her fraud claim, and on December 27, 2012, Defendant finalized the $12,800 provisional credit to D.A.'s account.  Defendant thus sustained an overall loss of $12,800.  (UF 18, 23, 29.)  Defendant did not contact Plaintiff regarding D.A's claim prior to finalizing the provisional credit.  (UF 30.)

On January 2, 2013, Senior Internal Investigator Karen Muth began her investigation into the unauthorized transactions on D.A.'s account.  (UF 33.)  Muth reviewed the files, including the summaries of the telephone calls with D.A.  Muth also conferred with the fraud claims and retail

---

[6] The court grants Defendant's motion to seal the fraud case notes on the grounds that Defendant's customer has a protected interest in the information contained therein, and that the documents contain confidential and sensitive information regarding Defendant's fraud investigation procedures.  However, the court finds that D.A.'s privacy is adequately protected by the use of her initials in this opinion, rather than her full name.  Additionally, the court finds that nothing about Defendant's internal procedures can be inferred by setting forth the quoted portions of the substance of D.A.'s communications with Defendant's investigators.  *See Kamakana*, 447 F.3d at 1178-79.

**United States District Court**
For the Northern District of California

investigation departments, and conducted additional research, such as verifying payments to one of the credit card companies and running an Accurint search on Plaintiff. (Muth Dep. 22-23, 25-26, 28, 32, 55, 133-34.) She did not speak with or interview D.A. (Muth Dep. 22.) On January 8, 2013, Muth notified Cipollina that she was investigating Plaintiff, and on January 9, 2013, Muth interviewed Plaintiff for approximately two hours. (UF 34, 35.) During the interview, Muth informed Plaintiff that viewing D.A.'s account on Defendant's systems violated Defendant's policies, which prohibit bank employees from viewing a family member's account for any reason. (UF 37.) Specifically, Defendant's Associate Handbook states that "[l]ooking up or obtaining information, and/or handling or processing transactions (e.g., reversing fees) on your own accounts or those of a family member, other relatives, or any one with a close personal relationship and/or making changes on any company computer system or other record of such accounts" is "prohibited conduct," and that engaging in prohibited conduct may lead to disciplinary action, including termination. (UF 38.)

Plaintiff initially denied accessing her cousin's account on Defendant's systems but later in the interview admitted she had done so. (UF 36, Feldman Decl. Ex. S (Investigator Diary).) Plaintiff admitted to Muth that she had personally conducted transactions totaling $12,800 from D.A.'s online banking account, but explained that D.A. owed her money, and that D.A. had verbally told Plaintiff to take the money from her banking account by conducting online transactions, including credit card payments. (UF 39, 40.) She also stated that D.A. had provided Plaintiff with her credentials to log onto D.A.'s online banking account. (UF 40.) According to Plaintiff, D.A. had come from Morocco to San Francisco to study English in January 2011. At D.A.'s family's request, Plaintiff helped D.A. with her living arrangements in California, including paying her rent and buying her furniture. (Aghmane Decl. Oct. 9, 2014, ¶ 12.) D.A.'s family later made arrangements to repay Plaintiff by transferring money from D.A.'s bank account. (Aghmane Decl. ¶ 14.)

During her interview with Muth, Plaintiff prepared and signed a voluntary statement. (UF 45.) In her statement, Plaintiff wrote that she and D.A. agreed on the amount of $12,800 and that D.A. asked Plaintiff "to make a transfer to cover that amount." Plaintiff admitted that she had

**United States District Court**
For the Northern District of California

1   accessed D.A.'s online banking account and made payments totaling $12,800.[7]  (UF 46, 49.)  She

2   also admitted that she had logged on to D.A.'s account from Defendant's systems but stated that she

3   couldn't recall why she had done so.  Plaintiff also acknowledged that she was aware of Defendant's

4   "policy not to access family member's account under no circumstances."  (UF 47, 48.)  In her

5   statement, Plaintiff wrote

6       I had no intention of deceiving the Bank and I used my name to pay my credit card
        and to log in to the account. . . . I would of [sic] never put myself or the Bank and
7       my colleagues in this situation had I known or suspected [D.A.] was doing and ill
        intentions [sic]. . . . if I had a 1% doubt that this situation would cause the Bank any
8       losses I would of [sic] contacted [Cipollina] immediately.

9   (UF 51.)  It is undisputed that Plaintiff was not a signer on D.A.'s account, nor did she have power of

10  attorney over D.A.'s account.  Further, D.A. never notified Defendant that Plaintiff was authorized to

11  use her account.  (UF 42-44.)

12      Following the interview, Plaintiff was placed on administrative leave pending the outcome of

13  the investigation.  (UF 52.)  Later that day, Plaintiff emailed Muth attaching documentation of the

14  money that she had spent on D.A.'s behalf, including hotel receipts, the lease agreement for D.A.'s

15  apartment, and the security deposit and rent payments she had made on D.A.'s behalf, totaling

16  $13,322.  (Aghmane Decl. Ex. G.)

17      After Plaintiff's interview, Muth contacted Defendant's Advice & Counsel department, an

18  internal human resources group.  (UF 53, 54.)  An Advice & Counsel advisor discussed Plaintiff's

19  actions with Muth and Cipollina, and recommended that Plaintiff be terminated for a Code of Ethics

20  violation.  (UF 55, 56.)  Defendant's Code of Ethics provides that employees may be terminated for

21  violation of the Code and other policies applicable to its employees, and a violation of the Associate

22  Handbook may constitute violation of the Code of Ethics.  (UF 57, 58.)  Cipollina discussed

23  Stewart's recommendation that Plaintiff be terminated with his manager, Regional Executive Kathie

24  Sowa, and with Human Resources Manager Shelley Smith, both of whom agreed with the

25  recommendation to terminate Plaintiff's employment.  (UF 61, 62, 64, 65.)  Although Cipollina

26  _____

27      [7]  The parties do not explain the $9,100 difference between the $12,800 that D.A. allegedly
    agreed to pay Plaintiff and the $21,900 in total transactions that were identified as payments or
28  attempted payments that Plaintiff made from D.A.'s account to pay Plaintiff's debts.

United States District Court

For the Northern District of California

1   initially expressed his desire that Plaintiff remain employed with Defendant, he ultimately agreed

2   with the recommendation of termination.  (UF 63, 66.)

3       Cipollina met with Plaintiff on January 11, 2013.  During their meeting, Plaintiff executed an

4   Acknowledgment of Debt and Repayment Agreement agreeing to repay Defendant $12,800.  (UF

5   70.)  In the Repayment Agreement, Plaintiff acknowledges that she is indebted to Defendant in the

6   sum of $12,800 as "the result of online bill pay," and that she "now wishes and agrees to make full

7   restitution in the amount of $12,800."  (UF 71.)  Prior to her meeting with Cipollina, Plaintiff had

8   reviewed the Repayment Agreement and discussed it with Muth.  (UF 67.)  Plaintiff signed the

9   Repayment Agreement, stating that she felt that her job depended on her signing it.  (Aghmane Decl.

10  ¶ 17.)  After signing the agreement, Cipollina handed Plaintiff a termination notice from Defendant.

11  (Aghmane Decl. ¶ 18; UF 68, 73.)  In its termination notice, Defendant states that Plaintiff's

12  "conduct, including Code of Ethics violation is not acceptable and has caused us to lose trust and

13  confidence in you as a bank associate.  Your personnel records will reflect that you are not eligible

14  for rehire with Bank of America."  (UF 69.)  Plaintiff has made monthly payments under the

15  Repayment Agreement since February 2013.  (UF 72.)

16      By January 1, 2013, nearly two weeks before Plaintiff's termination, Defendant had

17  calculated Plaintiff's anticipated 2012 bonus to be $110,000.  (UF 109.)  Plaintiff had received an

18  "exceeds" rating for the "what" and "how" aspects of her 2012 performance.  (UF 108.)  Defendant

19  made payments pursuant to the 2012 Incentive Plan on February 15, 2013, after Plaintiff's January

20  11, 2013 termination.  (UF 105.)  Plaintiff did not receive an incentive compensation payment for

21  2012.

22  **C.    Defendant's Reporting to Early Warning Services, LLC**

23      Early Warning Services, LLC ("EWS") is a third party that provides fraud prevention services

24  to member financial institutions, and maintains a database of members' former employees who were

25  released for knowingly causing or attempting to cause financial loss.  (UF 74.)  Defendant and EWS

26  have been parties to a contract regarding Defendant's participation in EWS's internal fraud

27  prevention services since 2006.  (UF 75.)  As a participating institution, Defendant is contractually

28  obligated to report an employee to EWS if Defendant, in its discretion, determines that the employee

United States District Court
For the Northern District of California

1    meets the reporting criteria.  (Cabrera Decl., Oct. 8, 2014, ¶ 4.)  In order for an individual to qualify

2    for EWS reporting, the following criteria must be met: 1) the employee must be a former employee;

3    2) the employee must have been at least 18 years old at the time of the incident; and 3) an oral or

4    written admission of criminal wrongdoing was obtained from the employee or there was conclusive

5    evidence of criminal wrongdoing by the employee.  (UF 76.)  Defendant's Director of the Regulatory

6    Inquiries & Internal Investigations Group testified that the phrase "conclusive evidence of criminal

7    wrongdoing" means "sufficient evidence to corroborate, and to lead the investigator to reasonably

8    believe, that a violation of the law occurred."  (Cabrera Decl. ¶ 6.)  EWS reporting must take place

9    within 30 days of an employee's termination.  (UF 77.)

10        Following Plaintiff's termination, Muth, in conjunction with an investigations manager,

11   determined that Plaintiff should be reported to EWS.  Muth testified that she took "everything" into

12   account in making this determination, including D.A's fraud statement; the fraud claim investigation,

13   which included the notes of the investigators' conversations with D.A.; Defendant's loss of $12,800;

14   and Plaintiff's admission that she had performed the transactions on D.A.'s account.  (UF 79; Muth

15   Dep. 25-26, 28, 124, 138.)  After Muth marked Plaintiff's file for submission to EWS, Defendant

16   automatically transmitted an electronic data file regarding Plaintiff to EWS on January 13, 2013.  (UF

17   78, 80, 81.)  The data Defendant submitted to EWS included Plaintiff's name, contact information

18   and social security number, as well as the investigation case number and date of monetary loss.  (UF

19   81, 82.)

20        In early March 2013, Plaintiff received an offer of employment from Chase Bank ("Chase"),

21   having passed all of Chase's pre-hiring screening processes.  (UF 84.)  On March 14, 2013, before

22   she started work, Plaintiff received an email from Chase notifying her that she was ineligible for hire

23   "due to an alert found with the Early Warning Services Fraud Scan from Bank of America."  (UF 85,

24   86.)  By correspondence dated March 18, 2013, Chase formally rescinded its employment offer,

25   stating "Our decision was based, in whole or in part, on information obtained from the consumer

26   reporting agency [EWS]."  (UF 86.)  Plaintiff filed a Notice of Dispute regarding her EWS record on

27   June 26, 2013.  (UF 87.)  A BANA internal committee reviewed Plaintiff's dispute and documents in

28   the internal investigation file, discussed the case with Muth, and ultimately upheld Plaintiff's EWS

United States District Court

For the Northern District of California

1    listing.  (UF 88, 89.)  In May 2013, Plaintiff started working as a Vice President, Commercial

2    Lending Officer at a non-EWS participating bank.  (UF 127.)

## II.  Procedural History

4            On June 27, 2013, Plaintiff filed a state court complaint against Defendant, as well as Bank of

5    America Corporation, and Merrill Lynch & Co., Inc.  It alleged eight causes of action under

6    California law.  Defendant removed the suit to federal court on August 9, 2013.  The parties

7    stipulated to dismiss Defendants Bank of America Corporation and Merrill Lynch & Co., Inc., and on

8    February 28, 2014, Plaintiff filed an amended complaint, alleging the following ten causes of action:

9    1) sex, race, and national origin discrimination under California's Fair Employment and Housing Act

10   (FEHA), California Government Code section 12940 *et seq.*; 2) violation of California's Equal Pay

11   Act, California Labor Code section 1197.5; 3) blacklisting under California Labor Code section 1050,

12   *et seq.*; 4) defamation; 5) intentional infliction of emotional distress; 6) negligent infliction of

13   emotional distress; 7) intentional interference with economic advantage; 8) negligent interference

14   with economic advantage; 9) failure to pay compensation in violation of California Labor Code

15   sections 201 and 204; and 10) waiting time penalties pursuant to California Labor Code section 203.

16   [Docket No. 42-1.]

17           Defendant moves for summary judgment, or in the alternative, partial summary judgment.

18   Plaintiff moves for partial summary judgment on her sex discrimination claim, her claims for

19   blacklisting and defamation, and her claims for failure to pay wages and waiting time penalties.

## III.  Legal Standard

21           A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

22   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of

23   establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

24   *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most

25   favorable to the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation

26   omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof

27   that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury

28

could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Where, as here, the parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

**IV. Discussion**

**A.    Preemption**

As a preliminary matter, Defendant argues that Plaintiff's claim for discriminatory termination, as well as claims three through ten, are preempted by Section 24 (Fifth) of the National Bank Act (NBA), 12 U.S.C. § 24 (Fifth).[8]

Section 24 (Fifth) gives a national bank the power "[t]o elect or appoint directors, and by its board of directors to appoint a president, vice president, cashier, and other officers . . . [and] dismiss such officers or any of them at pleasure."  12 U.S.C. § 24 (Fifth).  "The original congressional intent behind the at-pleasure provision of the Bank Acts was to ensure the financial stability of the banking

---

[8]  Thus, Defendant asserts preemption as to all of Plaintiff's claims except for her allegations regarding discriminatory actions short of termination, and the alleged violation of the California Equal Pay Act.

United States District Court

For the Northern District of California

1   institutions by affording them the means to discharge employees who were felt to compromise an

2   institution's integrity."  *Kroske v. U.S. Bank. Corp.*, 432 F.3d 976, 983-84 (9th Cir. 2005) (citation

3   and quotation marks omitted).  Under the United States Constitution's Supremacy Clause, state law

4   that conflicts with federal law has no effect, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516

5   (1992) (citing U.S. Const. art VI, cl. 2), and the Ninth Circuit has held that the NBA's "dismiss at

6   pleasure" provision preempts wrongful termination claims under state law.  *Inglis v. Feinerman*, 701

7   F.2d 97, 99 (9th Cir. 1983) (citing *Bollow v. Fed. Reserve Bank of San Francisco*, 650 F.2d 1093,

8   1098 (9th Cir. 1981)).  It also "bars contract claims challenging a bank's dismissal of an officer" as

9   well as state law tort claims.  *Kroske*, 432 F.3d at 984.

10          Plaintiff does not dispute the preemptive nature of Section 24 (Fifth), nor does she dispute

11   that she was an "officer" who served at the pleasure of Defendant's Board of Directors.  Instead, she

12   argues that Section 24 (Fifth) does not preempt claims that arise under FEHA because FEHA is

13   consistent with federal anti-discrimination law, which falls outside the NBA's preemptive power.

14   *See Kroske*, 432 F.3d at 987 (by implication, federal Age Discrimination in Employment Act

15   (ADEA) repealed dismiss-at-pleasure provision of § 24 (Fifth), but "only to the extent necessary to

16   give effect to the ADEA"; holding age discrimination claim brought under Washington state anti-

17   discrimination law not preempted because state law "mirrors the substantive provisions of the ADEA

18   and is interpreted consistently with the ADEA"); *see also Lambright v. Fed. Home Loan Bank of San*

19   *Francisco*, No. C 07 4340 CW, 2007 WL 4259552, at *5 (N.D. Cal. Dec. 3, 2007) (analyzing similar

20   "at pleasure" provision of the Federal Home Loan Bank Act[9], concluding that "the FEHA limits a

21   [bank's] . . . power to dismiss at pleasure 'officers, employees, attorneys, and agents' only to the

22   extent of allowing [] claims under state law that mirror Title VII" (citing *Kroske*, 432 F.3d at 987)).

23   In its reply, Defendant concedes that only partial preemption applies to Plaintiff's FEHA termination

24   claim, and that the effect of the partial preemption is to limit Plaintiff's claim to the standards and

25

26          [9] The NBA, Federal Home Loan Bank Act (FHLBA), 12 U.S.C. § 1432(a), and the Federal
27   Reserve Act (FRA), 12 U.S.C. § 341 (Fifth), confer on national banks, Federal Home Loan Banks, and
     Federal Reserve Banks  the authority to dismiss "at pleasure."  Courts cite authority on these Acts
     interchangeably.  *See Lambright*, 2007 WL 4259552, at *4 n.1 (citing *Osei-Bonsu v. Fed. Home Loan*
28   *Bank of New York*, 726 F. Supp. 95, 97-98 (S.D.N.Y. 1989)).

United States District Court

For the Northern District of California

1    remedies provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*  (*See*

2    Def.'s Reply 4.)  Pursuant to *Kroske*, Plaintiff may only pursue her FEHA claims to the extent they

3    are consistent with Title VII.  *See Lambright*, 2007 WL 4259552, at *5 (holding former bank

4    employee could pursue FEHA claims "to the extent that they mirror Title VII causes of action";

5    noting FEHA, unlike Title VII, allows unlimited compensatory and punitive damages, dismissing

6    claims against individual defendants because individual employees cannot be liable under Title VII).

7

8        Defendant asserts that the remaining challenged claims[10] "could not exist but for [Plaintiff's]

9    termination, and are therefore preempted."  (Def.'s Reply 5.)  Plaintiff responds that those claims are

10   not related to or based upon her termination, and therefore are not preempted.  The Ninth Circuit

11   provided guidance on the scope of preemption in *Walleri v. Federal Home Loan Bank of Seattle*, 83

12   F.3d 1575, 1582 (9th Cir. 1996).  In *Walleri*, the court applied a similar "dismiss at pleasure"

13   provision of the FHLBA, dismissing as preempted an intentional infliction of emotional distress

14   claim based upon allegations regarding the manner in which the plaintiff's supervisors had treated her

15   during her employment, including terminating her.  *Id.*  The court reasoned that it did "not think that

16   the statutory power to dismiss at pleasure necessarily preempts claims based on an employer's

17   wrongful act directed at the employee *outside of the employment relationship*"; instead, preemption

18   occurs where "the conduct complained of relates solely to the employment relationship."  *Id.*

19   (emphasis added).  The court held that the plaintiff's emotional distress allegations were "all

20   addressed to defendants' management of the employment relationship" with the plaintiff and were

21   thus preempted, noting that the FHLBA's grant of power to dismiss employees at pleasure "left no

22   room for oversight under state law over the manner in which that power is exercised."  *Id.*

23       Applying *Walleri*, the court finds that some but not all of Plaintiff's remaining claims are

24   preempted by Section 24 (Fifth).  Plaintiff's blacklisting and defamation claims are based upon

25   Defendant's post-termination report to EWS.  Defendant argues that Section 24 (Fifth) preempts

26   ────────────────

27       [10] Blacklisting, defamation, intentional infliction of emotional distress, negligent infliction of
     emotional distress, intentional interference with economic advantage, negligent interference with
28   economic advantage, failure to pay compensation, and California Labor Code section 203 waiting time
     penalties.

these claims because they are closely tied to the reasons for Plaintiff's termination.[11]  However, Defendant reported Plaintiff's alleged conduct to EWS after it terminated her.  While it is true that the basis for the EWS report mirrored the stated basis for her termination, Defendant took the independent and subsequent action of filing the EWS report.  Accordingly, the report to EWS was "outside of the employment relationship"; it was not part of Defendant's "management of the employment relationship."  *See Walleri*, 83 F.3d at 1582.  The conclusion that Section 24 (Fifth) does not preempt Plaintiff's defamation and blacklisting claims based upon post-termination acts is consistent with both *Walleri* and the purpose of the "dismiss at pleasure" provision.  The provision "afford[s] [banks] the means to discharge employees who were felt to compromise an institution's integrity" in order to "ensure the financial stability of the financial institutions."  *Kroske*, 432 F.3d at 984 (citation and quotation marks omitted); *see Westervelt v. Mohrenstecher*, 76 F. 118, 122 (8th Cir. 1896) ("it is essential to the safety and prosperity of banking institutions that the active officers, to whose integrity and discretion the moneys and property of the bank and its customers are intrusted, should be subject to immediate removal whenever the suspicion of faithlessness or negligence attaches to them.").  Section 24 (Fifth) preemption serves this purpose by granting banks near-absolute discretion in making decisions in the course of "management of the employment relationship," including the decision to terminate an officer.  *See Walleri*, 83 F.3d at 1582.  However, once a bank dismisses an employee, the need for such discretion is no longer present.  Thus, Plaintiff's defamation and blacklisting claims, both of which are based upon Defendant's post-termination reporting to EWS, are not preempted.  Similarly, Plaintiff's negligent and intentional interference with economic advantage claims are based upon Defendant's reporting "false statements" to EWS.  (Am. Compl. ¶¶ 93, 97, 98.)  Accordingly, they are not preempted.

Plaintiff asserts that her intentional and negligent infliction of emotional distress claims arise from two bases: 1) Defendant's alleged unlawful discrimination and 2) post-employment blacklisting

---

[11] The only support Defendant cites in support of its position is *Valdez v. Bank of America*, No. GCG-09-493440, 2012 WL 3101662, at *2-3 (Cal. App. July 31, 2012), an unpublished California Court of Appeal decision in which the court held that the NBA preempted wrongful termination and defamation claims.  However, the court's discussion was limited to whether the plaintiff was an "officer" of the defendant bank for purposes of Section 24 (Fifth); it did not analyze the scope of preemption.  Therefore, *Valdez* did not reach the present issue.

United States District Court

For the Northern District of California

1    and defamation based on Defendant's reporting to EWS.  (*See* Pl.'s Opp'n 24.)  Accordingly,

2    Plaintiff's emotional distress claims are partially preempted to the extent that they are based upon

3    Defendant's "management of the employment relationship" with Plaintiff, or pre-termination actions.

4    *See Walleri*, 83 F.3d at 1582.  To the extent that the claims are based upon Defendant's reporting to

5    EWS, they are not preempted.

6         Plaintiff's remaining claims are for failure to pay compensation and waiting time penalties,

7    based upon Defendant's failure to pay her the 2012 bonus following her termination.  These claims

8    do not challenge Defendant's decision to terminate Plaintiff, nor are they addressed to Defendant's

9    management of the employment relationship with Plaintiff, as Plaintiff does not challenge

10   Defendant's Incentive Plan eligibility requirements.  Instead, these claims are based upon Plaintiff's

11   claim that the 2012 bonus constituted earned wages and was thus payable upon termination.

12   Accordingly, the court finds that these claims are not preempted by Section 24 (Fifth).

13   **B.    Plaintiff's Sex Discrimination Claims Under the FEHA**

14        Plaintiff's first cause of action is for violation of FEHA, California Government Code section

15   12940, including subdivisions (a) (discharge or discrimination in employment); (c) (discrimination in

16   training); (i) (aiding and abetting); (j) (harassment); and (k) (failure to prevent discrimination or

17   harassment).  Plaintiff alleges that "she was denied a work environment free of discrimination and/or

18   retaliation, denied equal pay, denied promotion, denied commissions and other compensation,

19   wrongfully terminated, and labeled as having an 'Unfavorable Employment Record' in EWS."  (Am.

20   Compl. ¶ 56.)  In her opposition, Plaintiff abandons her claims for discrimination in training, aiding

21   and abetting, and harassment.  In addition, she abandons her claims for discrimination on the basis of

22   race and national origin.  Therefore, Plaintiff's remaining FEHA claims are for sex discrimination

23   and failure to prevent sex discrimination.  Plaintiff's sex discrimination claims are based upon her

24   termination as well as differential treatment regarding compensation, sales leads, post-maternity

25   leave sales goals, and promotion.  The court will first address her termination claim and then consider

26   her differential treatment claims.

27        **1.    Discriminatory Termination**

28           **a.    Legal Standard**

**United States District Court**
For the Northern District of California

Under FEHA, it is illegal for an employer to discriminate against an employee "in compensation or in terms, conditions, or privileges of employment" on the basis of sex.  Cal. Gov't Code Code § 12940(a).  Courts apply the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 355-56 (2000) (applying *McDonnell Douglas* framework in age discrimination claim brought under FEHA); *see also Metoyer v. Chassman*, 504 F.3d 919, 941 (9th Cir. 2007) ("California courts apply the Title VII framework to claims brought under FEHA." (citing *Guz*, 24 Cal. 4th at 354)).  The *McDonnell Douglas* test "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially." *Guz*, 24 Cal. 4th at 354.

In the first step of the *McDonnell Douglas* test, the plaintiff must first establish a *prima facie* case of discrimination, the elements of which may vary depending on the particular facts.  *Id.* at 355. Generally, to establish a *prima facie* case, the plaintiff must show: "(1) [plaintiff] was a member of a protected class, (2) [plaintiff] was qualified for the position [he or she] sought or was performing competently in the position [he or she] held, (3) [plaintiff] suffered an adverse employment action, such as termination, demotion, or denial of an available job and (4) some other circumstance suggests discriminatory motive." *Id.* (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996) (analyzing FEHA age discrimination claim)).  "While the plaintiff's prima facie burden is 'not onerous,' he must at least show 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion.'" *Guz*, 24 Cal. 4th at 355 (alteration in original) (internal citations and quotation marks omitted).

If the plaintiff makes the required showing at the first step, "a presumption of discrimination arises." *Id*. at 355.  The burden then "shifts to the employer to rebut the presumption" by articulating a "legitimate, nondiscriminatory reason" for the adverse employment action. *Id*. at 355-56.  Finally, in the third step, if the employer rebuts the presumption of discrimination, "[t]he plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.  In an appropriate case, evidence of dishonest

**United States District Court**

For the Northern District of California

reasons, considered together with the elements of the prima facie case, may permit a finding of prohibited bias." *Id*. at 356.  A "plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal quotation marks omitted).  If a plaintiff uses circumstantial evidence to satisfy this burden, "such evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue." *Id.* at 1222.  "An employee in this situation cannot simply show the employer's decision was wrong, mistaken, or unwise." *Morgan v. Regents of the Univ. of Cal.*, 88 Cal. App. 4th 52, 75 (2000) (internal quotation marks omitted).  "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence . . . and hence infer that the employer did not act for the . . . non-discriminatory reasons." *Id.* (internal quotation marks and citation omitted).

        **b.**     **Analysis**

Defendant argues that Plaintiff cannot establish a *prima facie* case because she cannot show that she adequately performed her job, as she was terminated for a Code of Ethics violation, nor can she demonstrate that Defendant terminated her under "circumstance[s] suggest[ing a] discriminatory motive." *See Guz*, 24 Cal. 4th at 355.

Plaintiff attempts to characterize the reason for her termination as "violating [Defendant's] Code of Ethics because she looked at her cousin's account."  (Pl.'s Opp'n 13.)  Plaintiff concedes that accessing a family member's account is a violation of Defendant's policy, but contends that Defendant applied the policy in a discriminatory manner by not disciplining or terminating male Client Managers who engaged in similar behavior.

As a preliminary matter, Plaintiff's statement that she was terminated for simply "looking" at her cousin's account is a mischaracterization.  Defendant's Associate Handbook prohibits "[l]ooking up or obtaining information, *and/or handling or processing transactions* . . . on your own accounts or those of a family member [or] other relatives," and provides that violation of this provision may result in a Code of Ethics violation.  (UF 38 (emphasis added), 58.)  Plaintiff's termination letter

United States District Court

For the Northern District of California

states that she was being terminated for her "conduct, including Code of Ethics violation." (UF 69.) The undisputed evidence indicates that Defendant made the decision to terminate Plaintiff after receiving a signed Fraud Statement from a client disputing online transactions, and obtaining Plaintiff's admission that she had accessed her cousin's account on Defendant's systems and performed the transactions in question, ultimately causing a loss of $12,800 to Defendant. (*See* Muth Dep. 104-05.) Plaintiff has failed to present any evidence suggesting her termination was motivated by sex discrimination. Specifically, Plaintiff has not presented evidence that other Client Managers committed similar actions and were not disciplined or terminated. The only "evidence" she cites in support of her position is her own unsupported testimony that her male colleagues also reviewed family accounts while at work. Plaintiff's testimony on this point is problematic for several reasons. First, her testimony includes non-specific, sweeping and conclusory statements such as "[e]very single bank associate has a family member, a friend that calls and requests information." (Plaintiff Dep. 530.) She also states "every team member was conducting transactions and helping their family members," and lists four male colleagues who she says "all assisted the families with their banking needs." (Plaintiff Dep. 538-39.) This testimony lacks foundation as Plaintiff has offered no evidence that she has personal knowledge of those matters, only stating that she knew colleagues assisted their family members in some unspecified way "[b]ecause they all talked about it." (Plaintiff Dep. 540.) Her coworkers' statements are also hearsay. Second, even if Plaintiff's testimony were admissible, it does not demonstrate that any of her colleagues engaged in actions similar to hers but were not disciplined. In other words, she does not identify any male colleagues who not only accessed family members' accounts, but made transactions later disputed as unauthorized that caused a loss to Defendant.

The only specific example cited by Plaintiff involves H.A., who Plaintiff claims was openly "managing his uncle's account." Plaintiff asserts that Cipollina was aware of this because they discussed it in pipeline meetings. (Plaintiff Dep. 536, 539.) Unfortunately, Plaintiff provides no other evidence regarding H.A.'s relationship to the account at issue, his involvement or role in the account, or Defendant's knowledge of the relationship. Therefore, it is entirely possible that H.A. was a signatory on the account, or was otherwise authorized to conduct transactions on the account.

United States District Court

For the Northern District of California

1  Moreover, there is no evidence that her colleague ever conducted any transactions that were later

2  disputed as unauthorized by his uncle or the accountholder, resulting in a loss to BANA.  On this

3  record, Plaintiff's insinuations about her colleague's alleged involvement with his uncle's account are

4  speculative, and are insufficient to create a dispute of material fact as to whether "other [male]

5  employees with qualifications similar to her own were treated more favorably."  *See Godwin*, 150

6  F.3d at 1220.

7       Even if Plaintiff were able to establish a *prima facie* case of sex discrimination, the court finds

8  that Plaintiff has failed to present evidence that Defendant's reason for terminating her was a pretext

9  for sex discrimination.  Upon demonstrating a *prima facie*  case, the burden shifts to Defendant to

10  rebut the presumption of unlawful discrimination by producing admissible evidence that its actions

11  were taken for a legitimate, nondiscriminatory reason.  Defendant has done so, by presenting

12  unrebutted evidence that Plaintiff was terminated for accessing her cousin's bank account to make

13  transactions that the cousin claimed were unauthorized, resulting in a loss to Defendant.  Therefore,

14  the burden shifts back to Plaintiff to attack Defendant's reasons for her termination as a pretext for

15  discrimination or offer any evidence of discriminatory motive.  *Guz*, 24 Cal. 4th at 356.  Plaintiff

16  presents no direct evidence of discriminatory motive.  Accordingly, she must present "specific" and

17  "substantial" evidence of pretense in order to create a triable issue.  *See Godwin*, 150 F.3d at 1222.

18  Plaintiff has failed to do so.  The only evidence she cites to support her claim of pretext are her own

19  unsupported statements that male colleagues looked at and conducted transactions on family

20  members' accounts but were not disciplined.  As discussed above, Plaintiff's statements are

21  inadmissible, and in any event, too vague to compare to Plaintiff's conduct.  As Plaintiff has failed to

22  present a triable issue of fact regarding her ultimate burden of persuasion on the issue of

23  discriminatory termination, the court grants summary judgment on this claim in favor of Defendant.

24       **2.        Differential Treatment Regarding Terms of Employment**

25       Plaintiff also alleges sex discrimination in the terms of her employment, including

26  compensation, sales leads, promotion, and post-maternity leave sales goals.  Defendant moves for

27  summary judgment as to Plaintiff's entire differential treatment claim.  Plaintiff moves for summary

28  judgment as to her claim based upon post-maternity leave sales goals.  The court will first address

1    Plaintiff's compensation and promotion related claims before turning to her post-maternity leave

2    claim.

3                    **a.      Discrimination in Compensation and Promotion**

4           Plaintiff asserts that she was paid less than her male counterparts in base salary and incentive

5    compensation.  The parties do not cite any cases regarding the standard by which the court must

6    analyze a FEHA claim of sex-based wage discrimination.  However, the Ninth Circuit has analyzed a

7    Title VII claim of sex-based wage discrimination under the *McDonnell Douglas* disparate treatment

8    model of sex discrimination.  *See Spaulding v. Univ. of Wash.*, 740 F.2d 686, 700 (9th Cir. 1984).  As

9    courts apply the Title VII framework to claims brought under FEHA, *see Metoyer*, 504 F.3d at 941,

10   the court will apply that framework to Plaintiff's FEHA wage discrimination claim.

11          In order to make out a *prima facie* case of wage discrimination, a plaintiff must show that

12   "she was paid less than non-members of her class for work requiring substantially the same

13   responsibility," *Belfi v. Prendergast*, 191 F.3d 129, 139 (2nd Cir. 1999).  She must also show facts

14   sufficient to raise an inference of intentional discrimination.  *See Spaulding*, 740 F.2d at 700.

15   Defendant argues that Plaintiff cannot establish that she was paid less than similarly situated males,

16   nor can she show that decisions regarding her pay occurred under circumstances suggesting a

17   discriminatory motive.  *See Guz*, 24 Cal. 4th at 355.

18          Plaintiff, like other Client Managers, received an annual salary and participated in an

19   incentive plan.  At the end of 2009, the year Plaintiff moved to San Francisco and began reporting to

20   Cipollina, there were five Client Managers reporting to Cipollina, including Plaintiff.  Two were

21   male and three were female.  Defendant presents evidence that at the end of 2009, Plaintiff was paid

22   the second highest salary among the five Client Managers.  The only person who received a higher

23   salary was a woman.  (Greenough Decl., Oct. 7, 2014, Ex. A (BANA-01391.)  At the end of 2010,

24   Plaintiff received the third highest salary among the five Client Managers.  Of the two Client

25   Managers paid more, one was a woman and one a man, H.A., who was paid $360 more annually than

26   Plaintiff.  (Greenough Decl. Ex. A (BANA-01393.)  In 2011 and 2012, Plaintiff was the second

27   highest paid among the four Client Managers on Cipollina's team of two men and two women.

28   (Greenough Decl. Ex. A (BANA-01395, 01397.)  Only H.A. made more than Plaintiff in those years,

United States District Court

For the Northern District of California

earning only $260 more annually than Plaintiff.  (Greenough Decl. Ex. A (BANA-01395, 01397).)  In addition, Defendant notes that merit increases scheduled to become effective in February 2013 would have made Plaintiff the highest paid Client Manager on Cipollina's team had she not been terminated. (D.M. Smith Decl., Oct. 2014, Ex. D (BANA-01630.)

Therefore, the undisputed facts regarding salary illustrate that, at most, in several years, a male colleague earned an annual salary that was insignificantly higher ($260 to $360) than Plaintiff's annual salary.  Defendant sets forth three unrebutted explanations for the less than $500 difference between H.A. and Plaintiff's salaries.  Defendant demonstrates that H.A. had longer tenure than Plaintiff on Cipollina's team, as an employee of Defendant, and in the banking industry.  H.A. started working for Defendant in December 2005, almost two and a half years before Plaintiff, and reported to Cipollina's predecessor almost four years before Plaintiff transferred to Cipollina's team.  (H.A. Dep. 16.)  He started working in the banking industry in 2002, three years before Plaintiff entered the industry in 2005.  (H.A. Dep. 14-16; Feldman Decl. Ex. B.)

Regarding bonuses, Defendant presents evidence that throughout her employment, Plaintiff's bonuses reflect amounts similar to or in excess of her male colleagues.  In 2009, Plaintiff received a $40,000 bonus, the second highest bonus among the five Client Managers reporting to Cipollina. (Greenough Decl. Ex. A (BANA-01391.)  H.A., who received a bonus of $65,000, had a higher composite score than Plaintiff.  (D.M. Smith Decl. Ex. A (BANA-01613.))  In 2010, Plaintiff again received the second highest bonus, $50,000, with H.A. receiving $60,000.  H.A. had a higher BIO on which to base his bonus.  (Greenough Decl. Ex. A (BANA-01393).)[12]

In 2011, Plaintiff received a $90,000 bonus, the second highest bonus among the four Client Managers reporting to Cipollina, second only to H.A., who received $100,000.  (Greenough Decl. Ex. A (BANA-01395).)  H.A.'s composite score was 10% higher than Plaintiff's.  (D.M. Smith Decl. Ex. A (BANA-01623.))  Finally, for 2012, had Plaintiff remained employed and received a bonus, she

---

[12] As counsel confirmed at oral argument, Plaintiff does not assert that the method used to determine her or any other employee's composite score or BIO was discriminatory or even discretionary.  Indeed, Plaintiff does not identify any particular aspect of the Incentive Plan as having been applied in a discriminatory manner.

United States District Court
For the Northern District of California

1  would have received $110,000, which would have been the highest bonus among the four Client

2  Managers on Cipollina's team.  (UF 109; Greenough Decl. Ex. A (BANA-01397).)

3      Plaintiff does not refute any of the evidence showing her salary was consistently near the top

4  of the Client Managers reporting to Cipollina.  Nor does Plaintiff challenge or rebut any of the

5  evidence presented by Defendant to explain why H.A. earned a higher bonus or a slightly higher

6  annual salary than she did.  In fact, Plaintiff does not argue that H.A. is her male comparator for

7  purposes of establishing her claim for discriminatory compensation.  Instead, Plaintiff argues that

8  Defendant "artfully compares" her salary only to the Client Managers instead of to *Senior* Client

9  Managers.  Plaintiff claims, *without any supporting evidence*, that "[t]he undisputed evidence shows

10  that the skill, effort, responsibility, and working conditions to make [] sales was identical [for both

11  jobs]," and that at the very least, that the question of whether the jobs were substantially similar

12  should be put to a jury.  (Pl.'s Opp'n 18.)  This ignores, and in fact, blatantly contradicts the evidence

13  Plaintiff previously accepted as undisputed.  (*See* UF 111.)  According to the parties' joint statement

14  of undisputed facts, "Senior Client Managers belong to different job bands, receive higher goals,

15  have more responsibility regarding mentoring and leadership, and typically, but not always, have

16  more tenure than Client Managers."  (UF 111.)  Plaintiff offers no evidence from which a jury could

17  infer that, despite these agreed-upon differences, the two positions are nevertheless substantially

18  similar.  Plaintiff's comparison of her compensation with that of Senior Client Managers is thus

19  inapposite, given the stipulated fact that there are significant differences in the two positions.  *See*

20  *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (noting plaintiff may not choose

21  highest-paid employees for comparison for Equal Pay Act claim; proper comparator group includes

22  "employees of the opposite sex performing substantially equal work and similarly situated with

23  respect to any other factors, such as seniority, that affect the wage scale").

24      Plaintiff also argues that her overall compensation was affected by Cipollina's discriminatory

25  practice of giving the most favorable and lucrative sales leads almost exclusively to male Client

26  Managers.  Plaintiff testified that on one occasion, she complained to Cipollina that she felt like a

27  "step-child" following a meeting where he distributed 24 leads to her male colleagues and none to

28  her.  (Plaintiff Dep. 318-19.)  She also testified that when she started in San Francisco, the portfolio

United States District Court

For the Northern District of California

she received contained several accounts that were not large enough to qualify for business banking. (Plaintiff Dep. 92-93.)  She also claims that her portfolio had been stripped of the biggest clients, but her testimony on this point is not clear, and she presents no other evidence to support this contention. In any event, Plaintiff does not present any evidence regarding who made the decision to alter the portfolio or to suggest that it was altered based upon animus towards her because she was a woman. She also does not present any evidence that Cipollina actually distributed 24 sales leads to her male clients, and cites no other evidence regarding distribution of clients and sales leads.  Although she argues that her female colleagues, Jennifer Emmons-Koelemijer and Griselda Ceja, testified that the most lucrative leads from management were given to male Client Managers, there is no record evidence to support this assertion, as Plaintiff did not submit their testimony.

The court finds that Plaintiff has failed to show facts sufficient to raise an inference of intentional discrimination related to her pay.  Accordingly, as Plaintiff has failed to carry her burden on the issue of differential treatment based on sex in compensation and sales leads, Defendant is granted summary judgment on these claims.

Finally, Plaintiff argues that Cipollina had the discretion to recommend her for a promotion, and that based on her experience, tenure, and performance, he should have promoted her to the position of Senior Vice President, Client Manager.  In order to establish a *prima facie* case of discriminatory failure to promote, a plaintiff must show that 1) she belongs to a protected class; 2) she "applied and was qualified for a job for which the employer was seeking applicants"; 3) despite her qualifications, she was rejected; and 4) after her rejection, "the position remained open and the employer continued to seek applicants from persons of [plaintiff's] qualifications."  *See Perez v. Cnty. of Santa Clara*, 111 Cal. App. 4th 671, 675-76 (2003).

According to Plaintiff, during Cipollina's tenure, he promoted two men and no women to the Senior Vice President position.[13]  Plaintiff further claims that with respect to composite score, she outperformed one of the men promoted in each of the three years she worked for Cipollina, and that she outperformed the other for two out of the three years.

---

[13] Plaintiff did not cite any evidence on this point.  Therefore, the court does not know if this statement is correct and if so, what positions the two men held before they were promoted.

United States District Court

For the Northern District of California

In response, Defendant contends that Cipollina had three ascending categories of Client Managers reporting to him: 1) Vice President, Client Manager (Plaintiff's position); 2) Vice President, Senior Client Manager; and 3) Senior Vice President, Senior Client Manager.  (Greenough Decl. Ex. A.)  As a Vice President, Client Manager, Plaintiff was at the least senior level, but she argues that she should have been promoted two levels up to Senior Vice President, Senior Client Manager.  There is no evidence that Defendant has ever promoted an employee from Plaintiff's level to the position two levels up, skipping the middle level.  There is also no evidence that Cipollina filled any openings for Vice President, Senior Client Manager (the next position up from the position held by Plaintiff), during Plaintiff's tenure on Cipollina's team.  (*See* Greenough Decl. Ex. A.) Accordingly, Plaintiff has failed to prove a prima facie case of discriminatory failure to promote, as there is no evidence that Plaintiff "applied and was qualified for a job for which the employer was seeking applicants," and that "despite [her] qualifications, [she] was rejected."  *See Perez*, 111 Cal. App. 4th at 675-76. Accordingly, the court grants Defendant summary judgment on Plaintiff's failure to promote claim.[14]

### b.    Maternity Leave

Plaintiff's final sex discrimination claim is based upon her allegation that she was treated less favorably than male colleagues as the result of having taken a three-month maternity leave in 2011.[15] According to Plaintiff, upon her return to work, she was given twelve-month sales goals even though she had only nine months left in the year in which to achieve those goals.  In other words, Cipollina did not make a downward adjustment to her annual performance goals despite her three month absence, instead requiring her (and other female Client Managers who took maternity leave) to meet her full year goals in a shorter amount of time.  As a result of this practice, Plaintiff argues that she achieved a lower composite score and a corresponding lower bonus for 2011.  Plaintiff further asserts

---

[14] Because the court grants Defendant summary judgment on Plaintiff's sex discrimination claims, it need not reach its argument that certain of Plaintiff's claims are time-barred.

[15] Plaintiff began a maternity leave on February 4, 2011 and returned to work on April 29, 2011. (UF 95.)

1  that no male Client Manager ever took family leave of a similar length and so no male Client

2  Manager was ever held to this standard.  Both parties move for summary judgment on this claim.

3     Plaintiff's summary judgment motion is less than a model of clarity on this point.  In her

4  motion, she argues that this claim is based upon a disparate impact theory of discrimination,

5  emphasizing that such a claim "does not require a showing of discriminatory motive," a requirement

6  applicable to a disparate treatment theory of discrimination.  (*See* Pl.'s Mot. 10-11 (citing *Raytheon*

7  *Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) ("Under a disparate-impact theory of discrimination, a

8  'facially neutral employment practice may be deemed [illegally discriminatory] without evidence of

9  the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case.'"

10  (citation omitted))), CACI 2502 ("Disparate Impact (Gov. Code, § 12940(a))", 11 ("There is no need

11  for Plaintiff to prove that Cipollina acted with discriminatory animus.").)  In its opposition,

12  Defendant contends that it had no notice that Plaintiff ever intended to pursue a disparate impact

13  theory of discrimination based upon her post-maternity leave sales goals, and that it only learned of

14  this claim in Plaintiff's summary judgment motion.  In her reply, Plaintiff argues that this claim is not

15  solely based upon a disparate impact theory, but that it is also based on a disparate treatment theory,

16  in that Cipollina allegedly treated female Client Managers differently because of their sex.  (*See* Pl.'s

17  Reply 4.)  Because Plaintiff only raised her disparate treatment argument in her reply brief,

18  Defendant did not have an opportunity to respond.

19     At the hearing, the court ordered the parties to submit briefing regarding when and under what

20  circumstances Plaintiff identified her post-maternity leave sales goals claim.  According to

21  Defendant, it first learned of Plaintiff's maternity leave theory on August 25, 2014, when Plaintiff

22  served her mediation statement and raised an argument regarding the sales goals.[16]  Discovery closed

23  the next day, on August 26, 2014.  Defendant asserts that Plaintiff did not raise the claim in her

24  DFEH administrative complaint or plead the claim in her amended complaint.  Defendant further

---

[16] It is not clear whether Plaintiff's mediation statement included a reference to a disparate impact theory of discrimination based on these facts, or whether she only addressed a disparate treatment theory. (*See* Pl.'s Suppl. Brief, "Plaintiff also thoroughly discussed the liability and damages for differential treatment, related to maternity leave, in her confidential brief . . . prior to the August 2014 mediation.")

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

avers that Plaintiff failed to identify the claim in response to interrogatories that requested that Plaintiff state the basis for and facts supporting each FEHA subdivision that Plaintiff contends Defendant violated.  (Feldman Decl., Nov. 14, 2014, Exs. B, C.)  Defendant also asserts that when asked in deposition to identify the specifics of her lawsuit, Plaintiff did not identify this theory, instead only making a single passing reference to her post-maternity leave sales goals.

In response, Plaintiff argues that she has consistently alleged that she was denied equal compensation on the basis of her sex, including in her DFEH administrative complaint and her amended complaint.[17]  She points to the same March 14, 2014 deposition testimony highlighted by Defendant about her return to work following maternity leave:

> I went on maternity leave last week of January.  I came back from maternity leave May 15.  I had goals just like everyone else that I needed to meet by December 31st.  There was no discussions about me being pregnant or me coming back from pregnancy.  I was having a midyear review like everyone else, and I was grilled just like everyone else.  Luckily, I out-performed even after I came back from my maternity leave . . . and my June numbers were great.  I did work hard.

(Plaintiff Dep. 244.)  She also points to her testimony about the stress her female coworkers experienced returning to work following maternity leave, including Cipollina's "differential treatment" and "the way he basically treated them after that in terms of pressure and goals." (Plaintiff Dep. 364-66.)  Additionally, Plaintiff states that she questioned Cipollina about holding women who had taken maternity leave to twelve-month performance goals at his deposition, and that two other witnesses, Jennifer Emmons-Koelemijer and Griselda Ceja, discussed the subject at their depositions as well.  (Von Rock Decl., Nov. 14, 2014, Exs. B, C, D.)

The court has carefully reviewed Plaintiff's amended complaint and DFEH administrative complaint, as well as the highlighted deposition testimony and Plaintiff's discovery responses.  In her first cause of action for discrimination under FEHA, Plaintiff generally alleges "she was denied a work environment free of discrimination and/or retaliation, denied equal pay, denied promotion, denied commissions and other compensation, wrongfully terminated, and labeled as having an 'Unfavorable Employment Record' in EWS."  (Am. Compl. ¶ 56.)  She does not plead a claim of

---

[17] Thus, by inference, Plaintiff concedes that she did not specifically identify the post-maternity leave sales goals theory in her administrative charge or her amended complaint.

United States District Court
For the Northern District of California

1   discrimination based upon Defendant's leave policies, maternity leave policies, or the treatment she

2   received upon her return from leave, nor does she provide any notice of a disparate impact claim.

3   Plaintiff's DFEH administrative complaint is similarly general.  FEHA provides that a person

4   aggrieved by an unlawful practice "shall set forth the particulars" of an alleged unlawful practice in a

5   verified complaint submitted to the Department of Fair Employment and Housing (DFEH), including

6   "a description of the alleged act or acts of discrimination."  Cal. Gov't Code § 12960(b); Cal. Code

7   Regs. tit. 2 § 10002(a)(3).  Plaintiff's DFEH complaint alleges the following wrongful conduct:

8   "Salma Aghmane contends she was subjected to ongoing discrimination on the basis of her sex, race,

9   and national origin . . . Ms. Aghmane contends that she was denied equal pay, denied equal access to

10  client leads and other employment opportunities, denied promotion, denied her bonus, and denied a

11  workplace free of discrimination."  (Feldman Decl. Ex. L (DFEH Complaint).)  It makes no mention

12  of a disparate impact claim, or a claim concerning post-maternity leave performance goals.

13          Regarding the deposition testimony, Plaintiff's reference to her sales goals during the year she

14  took maternity leave was somewhat vague and not clearly related to any assertion that she was

15  subject to discrimination on this basis.  Although other witnesses testified briefly about the subject,

16  Plaintiff apparently did not seek any other discovery on this topic, which might have put Defendant

17  on clear notice of the claim.  Following her March 2014 deposition, Defendant propounded an

18  interrogatory asking Plaintiff to review her previous interrogatory responses and, for any response

19  that was no longer correct or complete, to state whatever information was necessary to correct or

20  complete it.  Plaintiff did not take this opportunity to set forth the basis for her maternity leave claim;

21  instead, in responses dated August 22, 2014, four days before discovery closed, Plaintiff responded

22  "[e]xcept for information provided in detail in Plaintiff's deposition and/or the depositions of other

23  witnesses in this case, Plaintiff is not currently aware of any interrogatory responses that are no

24  longer correct or complete."  (Feldman Decl., Nov. 14, 2014, Ex. C.)  Plaintiff does not dispute that

25  the first time she squarely raised the claim was the day before discovery closed.

26          Dismissal of Plaintiff's disparate impact theory of discrimination based upon post-maternity

27  leave sales goals is appropriate, as Defendant was not put on notice of the claim prior to the close of

28  discovery and did not have an opportunity to conduct relevant discovery.  *See Coleman v. Quaker*

27

*Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (affirming dismissal of plaintiffs' disparate impact claims of age discrimination under ADEA on grounds that they had not pled that theory of liability in their complaint and first raised claim in connection with motions for summary judgment); *Rosenfeld v. Abraham Joshua Heschel Day Sch., Inc.*, 226 Cal. App. 4th 886, 894 (2014) ("[d]isparate treatment and disparate impact claims are different theories of liability, with different elements, and must be specifically alleged.").

As to Plaintiff's disparate treatment theory of discrimination based upon post-maternity leave sales goals, Ninth Circuit precedent permits a court to dismiss claims at summary judgment for violation of Federal Rule of Civil Procedure 8 where a plaintiff fails to "'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (in ADA case, affirming court's refusal to consider claims based on different architectural barriers than those alleged in the complaint pursuant to Rule 8) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quotation omitted)); *see also Adobe Lumber Inc. v. Hellman*, No. CIV 2:05-1510 WBS EFB, 2010 WL 760826, at *5 (E.D. Cal. March 4, 2010) ("[a] plaintiff may not make vague and generic allegations in [the] complaint and simply add facts as discovery goes along without amending the complaint because to do so 'would read the 'fair notice' requirement out of Rule 8(a) and would seriously undermine the rule's goal of encouraging expeditious resolution of disputes.'" (quoting *Pickern v. Pier 1 Imports (U.S.), Inc.*, 339 F. Supp. 2d 1081, 1088 (E.D. Cal. 2004)).

Although the record raises serious concerns about whether Plaintiff gave Defendant "fair notice" of this claim, the court finds that Plaintiff gave enough notice of the claim such that dismissal at summary judgment on *Pickern* grounds would be unjust.  Plaintiff's disparate treatment claim related to post-maternity leave sales goals may proceed.  However, Plaintiff did not put Defendant on clear notice of the claim until the day before the discovery deadline.  Therefore, Defendant was prejudiced by the fact that it did not have an opportunity to conduct relevant discovery.  The court will allow Defendant to conduct limited discovery solely on Plaintiff's disparate treatment claim that Defendant discriminated against her on the basis of sex by requiring her to meet twelve-month sales goals in 2011 even though she had taken a three-month maternity leave, thus resulting in a lower

United States District Court

For the Northern District of California

1  composite score for that year and a corresponding lower bonus.  As Plaintiff had the opportunity to

2  conduct discovery relevant to her claim, she is not granted leave to conduct any further discovery.

3  The current case schedule, including the January 12, 2015 trial date, is **VACATED**.  Defendant is

4  granted leave to re-open Plaintiff's deposition for no longer than two hours solely for the purpose of

5  allowing questioning about her post-maternity leave sales goals claim.  It may also propound up to

6  five additional interrogatories.  This limited discovery period shall close on February 2, 2015.  By no

7  later than February 9, 2015, Defendant may file a motion for summary judgment on this claim, as

8  well as Plaintiff's failure to prevent discrimination claim and punitive damages claim (discussed

9  below) that does not exceed seven pages.  Plaintiff's opposition, which shall not exceed seven pages,

10  shall be filed by February 23, 2015.  Any reply shall not exceed five pages and shall be filed by

11  March 2, 2015.

12      **3.**    **Failure to Prevent Discrimination**

13      Section 12940(k) "prohibits an employer from failing 'to take all reasonable steps necessary

14  to prevent discrimination.'"  *Veronese v. Lucasfilm Ltd.*, 212 Cal. App. 4th 1, 28 (citing Cal. Gov't

15  Code § 12940(k)).  "This provision creates a statutory tort action with the usual tort elements [duty of

16  care to plaintiff, breach of duty, causation and damages]."  *Id.* (citations omitted) (brackets in

17  original).   As discussed above, the court allows Plaintiff's post-maternity leave sales goals claim to

18  proceed, subject to additional limited discovery by Defendant and a further summary judgment

19  motion.  Therefore, the court denies summary judgment on Plaintiff's failure to prevent

20  discrimination claim without prejudice to Defendant's right to renew its motion as to this claim after

21  the close of limited discovery, as set forth above.  *See Trujillo v. N. Cnty. Transit Dist.*, 63 Cal. App.

22  4th 280, 288-89 (1998) ("Employers should not be held liable to employees for failure to take

23  necessary steps to prevent [discrimination], except where the actions took place and were not

24  prevented.").

25  **B.**    **Equal Pay Act**

26      Plaintiff's second cause of action is for violation of the Equal Pay Act.  Plaintiff alleges that

27  she was "denied equal pay, denied promotion which would have resulted in higher wages, and denied

28  commissions and other compensation" on account of her sex.  (Am. Compl. ¶ 63.)

United States District Court

For the Northern District of California

To prove a *prima facie* violation of California's Equal Pay Act, a plaintiff must show that the defendant paid men more "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Cal. Labor Code § 1197.5(a); *Green v. Par Pools, Inc.*, 111 Cal. App. 4th 620, 628-29 (2003). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to show that the pay differential is based on a *bona fide* factor unrelated to sex, including experience, education, seniority, or production. *Id*. at 629-32. If the defendant establishes a bona fide factor, the burden shifts back to the plaintiff to show that the stated reasons are pretextual. *See id*. at 632.

As with her FEHA claim for discrimination in compensation, Plaintiff argues that her comparators are Senior Vice Presidents, who were two levels above her own job level. For the reasons stated above, Plaintiff failed to submit any evidence to support that her compensation should be compared to that of male Senior Vice Presidents. In fact, Plaintiff stipulated to facts indicating that such a comparison is inappropriate because there are significant differences in the two jobs: Senior Vice Presidents "belong to different job bands, receive higher goals, have more responsibility regarding mentoring and leadership, and typically, but not always, have more tenure than Client Managers." (UF 111.)   Accordingly, summary judgment is granted as to Plaintiff's Equal Pay Act Claim.

## C.      Defamation & Blacklisting

Plaintiff's third and fourth causes of action are for blacklisting in violation of California Labor Code section 1050 and defamation, respectively. Both of these claims are based upon the fact that Defendant reported Plaintiff in the EWS system following her termination and caused her to be rated as having an "Unfavorable Employment Record" in that system. (Am. Compl. ¶¶ 69-72, 74-82.) Plaintiff asserts that the representation that she has an "Unfavorable Employment Record" in the EWS system is false and defamatory and has injured Plaintiff and her reputation in the banking and business community, causing her to lose a lucrative position with another bank. (Am. Compl. ¶¶ 72, 77, 80.) Plaintiff further alleges that Defendant's reporting to EWS was made with malice. (Am. Compl. ¶ 78.) The parties each move for summary judgment on these claims.

### 1.      Defamation

United States District Court

For the Northern District of California

1    A claim for defamation requires the following elements: "(a) a publication that is (b) false, (c)

2    defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special

3    damage.'"  *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).  "Publication" requires some communication,

4    whether oral or written.  Cal. Civ. Code §§ 45, 46.

5    Defendant argues that it is entitled to summary judgment on this claim because Plaintiff

6    cannot establish that it made a false statement about Plaintiff to EWS.  As a preliminary issue, the

7    parties dispute the meaning of Defendant's reporting Plaintiff to EWS.  Defendant argues that it only

8    reported a string of data about Plaintiff, including her name, contact information, and other

9    identifying information, and that each piece of data was true.  A reasonable jury could easily reject

10   this characterization.  EWS "maintain[s] a database of fraud information related to employees who

11   were released by a financial institution because they knowingly caused or attempted to cause

12   financial loss."  (Cabrera Decl. Ex. A at BANA-00808.)  There is no dispute that in order to report a

13   former employee to EWS, a participating bank must have either an admission of criminal wrongdoing

14   or "conclusive evidence of criminal wrongdoing."  Therefore, a reasonable jury could conclude that

15   submitting an individual's name to EWS is itself a representation of facts about that individual; i.e.,

16   that the reporting bank has either an admission or conclusive evidence of a financial crime by the

17   individual.

18   Plaintiff argues that this representation was false.  She asserts that she did not admit to

19   criminal wrongdoing; instead, she explained to Muth that she had D.A.'s permission to conduct the

20   online transactions in order to repay herself the money owed by D.A.  She also told Muth that she had

21   documentation to support her claim, which she later provided to Muth, and set forth the

22   circumstances leading up to the online transactions in her written statement.  She also denied any

23   intent to defraud BANA or cause it a loss in her written statement.  Therefore, Plaintiff argues that

24   Defendant did not have a written admission of wrongdoing or conclusive evidence of wrongdoing.  In

25   fact, according to Plaintiff, Defendant had the opposite, for Plaintiff had provided a written statement

26   denying wrongdoing.

27   In response, Defendant provides testimony that the phrase "conclusive evidence of criminal

28   wrongdoing" for purposes of EWS reporting means "sufficient evidence to corroborate, and to lead

United States District Court

For the Northern District of California

1  the investigator to reasonably believe, that a violation of the law occurred."  (*See* Cabrera Decl. ¶ 6.)

2  According to Defendant, the undisputed facts show that Muth "reasonably believe[d]" that Plaintiff

3  had committed criminal wrongdoing, and accordingly, its reporting to EWS was appropriate.  D.A.

4  provided Defendant with a Fraud Statement affirming that she had not authorized the transactions at

5  issue, and had a number of telephone conversations with Defendants' fraud analysts in which she

6  denied having given Plaintiff her account information.  During these calls, Defendant told D.A. of

7  Plaintiff's suspected involvement and explained that D.A. had the right to withdraw her claim at any

8  time, but D.A. never withdrew the claim.  Plaintiff admitted that she conducted the transactions in her

9  cousin's account even though she was not an account signatory, and did not possess a  power of

10  attorney.  She also conceded that she benefitted from the transactions, having made payments to her

11  credit card companies.  Defendant sustained a loss as a result of these transactions, and Plaintiff

12  signed a repayment agreement accepting responsibility for the bank's loss.  Defendant argues that

13  these facts constitute "sufficient evidence to corroborate, and to lead the investigator to reasonably

14  believe, that a violation of the law occurred," thereby meeting the prerequisite for EWS reporting.

15        Defendant's position rests upon its own interpretation of the EWS reporting standard.  The

16  EWS documentation requires "conclusive evidence of criminal wrongdoing."  Defendant's declarant

17  testified that this means "sufficient evidence to corroborate, and to lead the investigator to reasonably

18  believe, that a violation of the law occurred."  (Cabrera Decl. ¶ 6.)  A reasonable jury could conclude

19  that Defendant's declarant is not credible because her definition significantly waters down the plain

20  meaning of EWS' "conclusive evidence" standard.  The Merriam-Webster Online Dictionary defines

21  "conclusive" as "putting an end to debate or question especially by reason of irrefutability."  *See*

22  Merriam Webster Online Dictionary, http://merriam-webster.com/dictionary/conclusive (last visited

23  Dec. 2, 2014).  A reasonable jury could apply this definition and decide that Defendant did not have

24  "conclusive" evidence of wrongdoing, as Plaintiff emphatically refuted the allegation that she

25  performed unauthorized transactions during her interview and in her written statement, and Muth did

26  not conduct further investigation, such as contacting D.A. to discuss Plaintiff's side of the story.

27  Therefore, the court finds that a dispute of material fact exists as to whether the publication, i.e.

28  Defendant's reporting to EWS, was false.

United States District Court

For the Northern District of California

Defendant next argues that Plaintiff's defamation claim fails because Defendant's communication to EWS is protected by the common interest privilege. California Civil Code section 47(c) grants a conditional privilege against defamation to communications made without malice on subjects of mutual interest. A privileged publication is made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." Cal. Civ. Code § 47(c). While defendants have the burden of proving that an allegedly defamatory statement falls within the scope of the common interest privilege, plaintiffs have the burden of proving that the statement was made with malice. *Lundquist v. Reusser*, 7 Cal. 4th 1193, 1203 (1994). "[I]f malice is shown, the privilege is not merely overcome; it never arises in the first instance." *Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 723 n.7 (1989). Here, Plaintiff does not dispute that Defendant's reporting Plaintiff to EWS was a statement made between interested persons. Therefore, the burden shifts to Plaintiff to prove that the statements were made with malice. *Lundquist*, 7 Cal. 4th at 1203.

The malice necessary to defeat an assertion of the qualified privilege is "actual malice," which may be established in two ways: "[1] by a showing that the publication was motivated by hatred or ill will towards the plaintiff or [2] by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Sanborn v. Chronicle Pub. Co.*, 18 Cal. 3d 406, 413 (1976) (citation omitted); *see also Rollenhagen v. City of Orange*, 116 Cal. App. 3d 414, 424 (1981) ("a statement made with 'actual malice' has been defined as one made with knowledge that it was false or with a reckless disregard of whether it was false or not.") (citations omitted), *disapproved on other grounds in Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 738 (1989); *Cuenca v. Safeway San Francisco Employees Fed. Credit Union*, 180 Cal. App. 3d 985, 997 (1986).

Plaintiff does not assert the existence of hatred or ill will toward Plaintiff. Instead, she argues that Defendant acted with actual malice because it lacked reasonable grounds to believe that it possessed conclusive evidence of criminal wrongdoing by Plaintiff when it reported her to EWS. Specifically, Plaintiff argues that despite providing Muth with documentation of her cousin's debt to

her, Defendant chose not to look further into the matter; thus, Defendant made a deliberate decision not to acquire knowledge of facts that could prove the falsity of the claims against Plaintiff.  Plaintiff argues that Muth should have investigated further to determine whether in fact the transactions were authorized.  According to Plaintiff, this failure amounted to reckless disregard, thereby defeating the qualified privilege asserted by Defendant.  However, for purposes of determining the applicability of the common interest privilege, while "a lack of inquiry and investigation *may* supply the sufficient inference of lack of good faith or negligence sufficient to supply the element of malice" in light of all of the relevant evidence, mere failure to inquire alone "cannot constitute lack of reasonable or probable cause" to believe in the truth of the publication.  *Rollenhagen*, 116 Cal. App. 3d at 423; *see also Vackar v. Package Machinery Co.*, 841 F. Supp. 310, 314 (N.D. Cal. 1993) ("Mere negligence in investigating the truth of the allegedly defamatory statements is insufficient to establish malice.").  Plaintiff's actual malice claim rests solely on her allegation that Defendant failed to conduct an adequate investigation.  This alone is insufficient to establish malice as a matter of law.  There is no evidence to suggest that any purported negligence on Muth's part "amount[ed] to a reckless or wanton disregard for the truth."  *See Rollenhagen*, 116 Cal. App. 3d at 424 (citing *Roemer v. Retail Credit Co.*, 3 Cal. App. 3d 368, 371-72 (1970)).[18]

Because Defendant's reporting Plaintiff to EWS was a statement made between interested persons, and because Plaintiff has failed to raise triable issues of fact regarding whether Defendant acted with malice, the common interest privilege in Section 47(c) applies.  As privileged statements are not defamatory, the court grants Defendant summary judgment on Plaintiff's defamation claim.  *See McGrory v. Applied Signal Tech., Inc.*, 212 Cal.App.4th 150, 1541 (2013) (granting summary judgment for employer on employee's defamation claim, where employee failed present evidence

---

[18] Plaintiff also cites *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009, 1016 (1990), for the proposition that negligent acts can defeat the common interest privilege in cases involving private persons.  This statement is an incorrect summary of the cited section of *Carney*; in that case, the court held that a jury should have been instructed that "negligence, rather than malice," was an element of the private plaintiff's libel claim.  *Id.* at 1016.  It did not address negligence for purposes of establishing actual malice to defeat the common interest privilege.  *See Rollenhagen*, 116 Cal. App. 3d at 423 (noting that in the context of proving malice to defeat Section 47 privilege, "[l]ack of reasonable or probable cause . . . is not . . . a simple negligence concept.").

United States District Court

For the Northern District of California

1  "giving rise to a reasonable inference either that [the employer] did not believe it when he said [it] or

2  that [the employer's] belief was unreasonable").

3       **2.    Blacklisting**

4       California Labor Code section 1050 imposes liability on any person who, after having

5  discharged an employee, makes misrepresentations preventing the former employee from obtaining

6  other employment.  In order to establish a blacklisting claim under section 1050, a plaintiff must

7  establish that 1) after the plaintiff's employment with a defendant ended, the defendant made a

8  representation to a prospective employer about the plaintiff; 2) the representation was not true; 3) the

9  defendant knew the representation was not true when it was made; 4) the defendant made the

10 representation with the intent of preventing the plaintiff from obtaining employment; 5) the plaintiff

11 was harmed; and 6) the defendant's conduct was a substantial factor in causing the plaintiff's harm.

12 CACI No. 2711; *see* Cal. Labor Code § 1050.

13      Defendant is entitled to summary judgment on Plaintiff's blacklisting claim.  The common

14 interest privilege pursuant to California Civil Code section 47 also applies to blacklisting claims.  *See*

15 *O'Shea v. Gen. Tel. Co.*, 193 Cal. App. 3d 1040, 1047 (1987) (applying Section 47 privileges to

16 plaintiff's claim for violation of California Labor Code section 1050); *Noel v. River Hills Wilsons,*

17 *Inc.*, 113 Cal. App. 4th 1363, 1372-73 (2003) (where Section 47(c) common interest privilege applied

18 to bar defamation claim, granting summary judgment on all other tort claims based on statements at

19 issue, including blacklisting, negligence, and emotional distress claims, noting "California courts

20 have held that plaintiffs may not avoid the strictures of defamation law by artfully pleading their

21 defamation claims to sound in other areas of tort law." (citations omitted)).  "California permits no

22 cause of action based upon the defamatory nature of a communication which is itself privileged under

23 the defamation laws." *Brody v. Montalbano*, 87 Cal. App. 3d 725, 738-39 (1978).  Accordingly, as

24 Defendant's reporting to EWS was a privileged statement as discussed above, the court grants

25 Defendant summary judgment on Plaintiff's blacklisting claim.

26 **D.    Emotional Distress Claims**

27      In order to establish a claim for intentional infliction of emotional distress, Plaintiff must

28 show "(1) extreme and outrageous conduct by [Defendant] with the intention of causing, or reckless

United States District Court

For the Northern District of California

disregard of the probability of causing, emotional distress"; (2) that Plaintiff "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by [Defendant's] outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (citations and quotation marks omitted). "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* at 1051 (citations and quotation marks omitted). Negligent infliction of emotional distress "is not an independent tort, but the tort of negligence." *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992) (emphasis removed). To proceed on a "direct victim" theory of negligent infliction of emotional distress, a plaintiff must prove that the defendant was negligent, including proving duty, breach of duty, causation, and damages. *Id.* The plaintiff must also prove that she suffered serious emotional distress and that the defendant's negligence was a substantial factor in causing the distress. *Id.* at 1072-74; CACI 1620.

As discussed above, the only portions of Plaintiff's emotional distress claims that survive preemption are her claims based upon Defendant's reporting to EWS. As the court concludes that the common interest privilege applies to Defendant's reporting, summary judgment is appropriate on Plaintiff's emotional distress claims as they also stem from Defendant's reporting. *See Noel*, 113 Cal. App. 4th at 1372-73 (2003) (granting summary judgment on emotional distress claims stemming from privileged communications). Accordingly, summary judgment is granted on Plaintiff's intentional and negligent infliction of emotional distress claims.[19]

**E.      Interference with Economic Advantage**

In order to establish a claim for intentional interference with prospective economic advantage, a plaintiff must establish five elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Youst v. Longo*, 43 Cal. 3d 64, 71 n.6 (1987). A

---

[19] Because the court concludes that Plaintiff cannot establish the first element of her claim for intentional infliction of emotional distress, it need not reach Defendant's argument that the California Workers' Compensation Act, California Labor Code section 3600 *et seq.*, preempts this claim.

United States District Court

For the Northern District of California

claim for negligent interference with prospective economic advantage requires a plaintiff to prove the same elements, except instead of proving intentional acts on the defendant's part, the plaintiff must prove that the defendant was negligent. *See N. Am. Chem. Co. v. Superior Court*, 59 Cal. App. 4th 764, 786 (1997).

The gravamen of Plaintiff's interference with economic advantage claims is that Defendant interfered with her "probable prospective employment" and corresponding economic advantage by making false statements about her to EWS. (Am. Compl. ¶¶ 93, 97.) According to Plaintiff, Defendant's false statements "prevent[] Plaintiff from obtaining employment with any bank, financial institution, or other employer who runs a report from EWS." (Am. Compl. ¶ 94.) In her opposition, Plaintiff clarifies that this claim is based upon both the offer of employment rescinded by Chase in March 2013, as well as any future employment prospects with EWS-participating banks.

Given the court's conclusion that the common interest privilege applies to Defendant's report to EWS, summary judgment is appropriate on Plaintiff's interference with economic advantage claims as they are based on the same communications. *See Noel*, 113 Cal. App. 4th at 1372-73 (2003); *see also Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 335, 344 ("Although the section 47 privileges were originally applicable only to defamation actions, case law now recognizes that the privileges apply to all torts except malicious prosecution"; affirming directed verdict on slander of title claim and JNOV on negligence claim where defendant's "conduct constituted privileged communications" pursuant to Section 47(c)); *Brody*, 87 Cal. App. 3d at 738-39. Therefore, summary judgment is granted on Plaintiffs intentional and negligent interference with economic advantage claims.

**F.      Failure to Pay Bonus and Waiting Time Penalties**

Plaintiff's ninth and tenth claims are for failure to pay all compensation due upon her termination. Plaintiff alleges that her 2012 incentive payment was a commission, not a discretionary bonus, and thus constituted "earned compensation" required to be paid at her termination. Both parties move for summary judgment on these two claims.

California Labor Code section 204.1 provides that "[c]ommission wages are compensation paid to any person for services rendered in the sale of such employer's property or services and based

United States District Court

For the Northern District of California

1   //

2   //

3   proportionately upon the amount or value thereof."  Therefore, in order to qualify as a commission,

4   the payment "must be a percent of the price of the product or service" sold.  *Keyes Motors, Inc. v.*

5   *Div. of Labor Standards Enforcement*, 197 Cal. App. 3d 557, 563 (1987); *see Burden v. SelectQuote*

6   *Ins. Servs.*, 848 F. Supp. 2d 1075, 1080 (N.D. Cal. 2012) ("[a] commission is based proportionately

7   upon an 'amount' where an employer pays an employee a uniform fee for each unit of property or

8   service sold.").  Here, under the terms of the Incentive Plan, Defendant does not calculate incentive

9   payments as a percentage of the price of the product or service sold.  Instead, the amount of the bonus

10  is based upon the employee's composite score or "what" performance rating, which is a percentage

11  comparison of the employee's performance to set goals, along with the "how" performance rating,

12  which is management's discretionary assessment of how an employee achieves results.  (Feldman

13  Decl. Ex. E; UF 100.)  As to the composite score or "what" rating, this metric does not purely

14  correlate to sales goals, as Plaintiff contends.  Instead, it is based upon "total revenue, asset quality,

15  new relationships, and pipeline."  (UF 99.)  The amount of the bonus also depends upon the line of

16  business and corporate performance.  (UF 100.)

17          In addition, the explicit, controlling terms of the Incentive Plan demonstrate that the bonus is

18  not "based proportionately on the 'amount or value' of the property or services an employee sells."

19  *Burden*, 848 F. Supp. 2d at 1080 (quoting Cal. Lab. Code § 204.1).  First, the terms make clear the

20  discretionary nature of the Plan, providing that "[m]anager judgment is . . . applied to incentive

21  decisions to ensure all circumstances affecting a portfolio are considered. . . . While individual

22  performance will have a strong correlation to incentive pay, management will have the judgment to

23  adjust awards."  In addition, it states "[t]he Incentive Plan is a performance-driven plan.  It is not

24  designed to be a commission/production-based plan.  All incentive opportunities are estimates, not

25  guarantees."  (Feldman Decl. Ex. E (BANA-00767.)  Further, the nature of the Incentive Plan is not a

26  commission-based plan.  The Incentive Plan states that bonuses are not only intended to "reward

27  current job performance," for the Plan's "most fundamental purpose is to provide an incentive for

28

United States District Court

For the Northern District of California

1    //

2    //

3    future individual performance of eligible Plan participants.  It is also designed not only to attract but

4    especially to retain qualified employees."  (UF 107; Feldman Decl. Ex. E (BANA-00770).  Plaintiff

5    does not present any evidence to rebut Defendant's facts about the characteristics and purposes of the

6    bonus payments.

7         The court finds that the undisputed facts show that Defendant's Incentive Plan does not

8    qualify as a commission under California law.  Plaintiff's arguments rest solely on her contention that

9    her anticipated 2012 incentive plan was a commission; she makes no arguments that the Incentive

10   Plan's eligibility requirements, including the requirement that only employees active as of the date

11   Defendant makes incentive payments are eligible for payments, do not otherwise apply to her.  *See*

12   *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 612, 621 (2009) ("[e]ligibility to receive incentive

13   compensation 'is properly determined by the . . . plans' specific terms and general contract principles

14   . . . [o]nly when an employee satisfies the condition(s) precedent to receiving incentive

15   compensation, which often includes remaining employed for a particular period of time, can that

16   employee be said to have earned the incentive compensation (thereby necessitating payment upon

17   resignation or termination)." (citations omitted)).  Accordingly, the court grants Defendant summary

18   judgment on Plaintiff's claim for unpaid compensation and waiting time penalties.

19   **G.    Punitive Damages**

20        As discussed above, the court allows Plaintiff's post-maternity leave sales goals claim to

21   proceed, subject to additional limited discovery by Defendant and a further summary judgment

22   motion.  Therefore, the court denies summary judgment on Plaintiff's punitive damages claim

23   without prejudice to Defendant's right to renew its motion as to this claim after the close of limited

24   discovery, as set forth above.

25                                   **V.  Conclusion**

26        For the foregoing reasons, Defendant's motion for summary judgment is granted as to all

27   claims except Plaintiff's disparate treatment claim related to post-maternity leave sales goals,

28

California Government Code section 12940(k) claim for failure to prevent discrimination, and punitive damages claim.  Plaintiff's motion for partial summary judgment is denied.

IT IS SO ORDERED.

Dated: December 5, 2014



_____
DONNA M. RYU
United States Magistrate Judge